

# THE ATTORNEY GENERAL

## OF TEXAS

AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

July 24, 1957

Honorable J. Earl Rudder
Commissioner, General Land
    Office
Austin, Texas                Opinion No. WW-196

                        Re:  Whether or not the cost
                             of transporting gas ob-
                             tained from State leases
                             may be legally deducted
                             from the State's royalty
                             interest in the specific
                             instances as are outlined
                             herein.

Dear Mr. Rudder:

        In your letter requesting our opinion dated
May 24, 1957, you enclosed three memoranda from an
Assistant State Auditor, questioning the legality of
certain deductions of various costs involved in the pro-
cessing and transportation of gas before calculating the
royalty due the State. Because of the length of these
memoranda, each will not be set out in this opinion in
detail, but the pertinent and controlling facts may be
summarized as follows:

        There are three leases involved, all of which
were executed under the authority of Chapter 271, Acts
42nd Leg., 1931 (Art. 5421c,Sec.10, V.C.S.). The perti-
nent royalty provision of the statute is as follows:

        "The areas included herein shall be
    leased for a consideration, in addition to
    the cash amount bid therefor, of not less
    than one-eighth (1/8) of the gross pro-
    duction of oil, or the value of the same,
    that may be produced and saved, and not less
    than one-eighth (1/8) of the gross production

of gas or the value of the same . . . that may
be produced and sold off the area. . . ."

The three leases involved, respectively contain the
following covenants in regard to the royalty to be paid the
State:

"1. One-eighth of the gross production
of gas, or the value of the same,. . ."

"2. As a royalty on residue gas, one-
eighth of the value of the gross production,
sold or used off the premises. The value of
the residue gas to be based upon the highest
price paid or offered for residue gas in the
general area or that part which accrues to the
lessee, whichever is the greater."

"3. As royalty on any gas, including
residue gas, sold or used by the lessee for
any purpose, one-sixth of the value of such
gas to be sold or used, but in no event shall
the royalty be based upon a price of less
than the highest market price paid or offered
for gas in the general area or that part which
accrues to the producer, whichever is the
greater; . . . ., provided, however, lessee
agrees that before any gas containing liquid
hydrocarbons, recoverable in commercial quanti-
ties is sold or used, it will be run through
an adequate oil and gas separator to the end
that all liquid hydrocarbons recoverable from
the gas by such means will be recovered."

By the provisions of the three leases as shown
above, the first allows the State to take possession of
its fractional part of the gas produced in kind or to re-
ceive from the lessee the value thereof. The second and
third provisions do not provide that the State may re-
ceive its royalty in kind, but provide that the lessee
shall pay the State the cash value. It must be remembered,
however, that the language of the statute contols over the
terms of the leases, and that such leases can neither
diminish nor enlarge the State's royalty interest as set
out in the statute.

In each of the three instances upon which your question was based, there was no market at the well site for the gas produced. The State's lessees, in order to market the gas, constructioned various pipelines, compressors and hydrocarbon separators at their own expense and in which the State owns no interest. The royalty paid the State in each instance was based upon the price the producer was paid for the gas at the point such gas was transferred from the producer's pipeline to that of the purchaser, less one-eighth of the total cost of transporting and processing the gas produced between the well site and the place where the purchaser took delivery.

The question which you ask, based upon the above summary of facts, was whether or not the State could legally be charged its pro rata share of the cost of (1) transporting the gas from the well site to the purchaser, and (2) the cost of separating marketable hydrocarbons under the provision of the third lease agreement.

One point that seems clear in any lease executed under Section 10 of Art. 5421c is that where payment of money royalty is accepted by the State, that such payment is to be based upon the "gross production or value of the same" at the place where it is produced and we need not speculate on distinctions within the royalty clauses which do not exist in fact.

It is now generally accepted that the mouth of the well is the proper pricing point for determining the value of royalty gas. Scott v. Steinberger, et al., 213 P. 646 (Kan. 1923); Haynes v. Southwest Natural Gas Co., 123 F. 2d 1011 (C.C.A. 5th 1942). While no case has been found which specifically defined the term "gross production," the case of Arkansas Natural Gas Co. v. Sartor, 78 F.2d 924 (C.C.A. 5th, cert. den., 296 U.S. 656, 1935) held that "1/8th of the gas produced and sold from premises" meant average price "in the field at the well."

If there is no market at a specific well, evidence which shows the market price for gas at other wells, such gas being utilized in the same manner as the gas from the well in question, is admissible to enable the court to determine market value. Phillips Petroleum Co. v. Bynum, 155 F.2d 196, 199 (C.C.A.5th 1946, cert.den.,329 U.S. 714) and Phillips Petroleum Co. v. Ochsner, 146 F.2d 138 (C.C.A.5th, 1944). That part of the royalty provision in

leases number two and three as set out above, which sets out
how the value of royalty gas is to be determined, follows
closely the method used by the courts in determining such
value; and do not otherwise add anything of significance to
the lease contract.

There are no cases which have ever held that a
lessee must construct facilities for transporting or process-
ing gas without being permitted to charge something back
against the lessor. The lessee owes a duty to the lessor to
use diligence in marketing the product of the gas well, but
no court has ever held that the State or any other lessor
is entitled to a free ride to the marketing point. Mr. George
Siefkin in Rights of Lessor and Lessee With Respect to Sale
of Gas and to Gas Royalty Provisions, 4th Annual Institute
on Oil and Gas and Taxation, Southwestern Legal Foundation.

In two successive cases where the principal issue
was the method to be used in determining the value of royalty
gas where there was no market at the wells, the Fifth Cir-
cuit held that the proper royalty in such cases was one-
eighth of the proceeds of the actual sale, less a proper
credit for the cost of transportation, separation and sale.
Phillips Petroleum Co. v. Bynum, supra, and Phillips Petroleum
Co. v. Johnson, 155 F.2d 185 (C.C.A.5th cert.den.,329 U.S.
730, 1946). Substantially the same result has been reached
in Kretni Development Co. v. Consolidated Oil Corp., 74 F.2d
497 (C.C.A.10th,1934); Katschner v. Eason Oil Co., 63 P.2d
977 (Okla.1936). It will be noted that, although the word-
ing of the royalty clauses in the leases vary somewhat from
case to case, the same result has uniformly been reached.

In Danciger Oil & Refining Co. v. Hamill Drilling
Co., 141 Tex. 153, 171 S.W.2d 321 (1943) where the issue was
whether certain royalty payments provided for in an assign-
ment contract were to be based upon the value of gas produced
at the well, or its value after such gas had been processed
into other products, the court held that the royalty owner
was bound to accept payment out of the value of the gas at
the well and was not entitled to have it refined into some
other commodity. It is believed this case indicates that
the courts in this State would follow the "well head pricing
point" rule in the federal cases herein cited, unless the
contract clearly showed a contrary intent of the parties.

It, therefore, appears that the State may legally
be charged its pro rata share of transportation costs from
the well head, which is the pricing point for value of
royalty gas, to that point where title to the gas passes

to the purchaser. This means that where the value of the gross production of gas is computed from a price paid for such gas at a point not at the well, then in arriving at the royalty to be paid the State, a reasonable charge may be assessed for the use of necessary pipelines and processing equipment. It is our further opinion that the provision in Lease No. 3 cited above, that requires the lessee to remove hydrocarbons, if present in commercial quantities, does not change or affect that point at which the State's royalty interest is computed, and the lessee is entitled to deduct from the royalty paid the State's pro rata share of the expense incurred in the removal of such hydrocarbons.

Because of the wide possible variations between different situations requiring the lessee to build transporting and processing equipment in marketing gas, we are unable to lay down any general rules for assessing such charges against the State, and such charges in each individual case must be determined from the standpoint of accepted accounting principles, to be properly determined by the State Auditor.

## SUMMARY

Under all leases executed by the General Land Office under the authority of Chapter 271, Acts 42nd Leg., 1931, where the value of royalty gas is computed on the basis of a purchase price paid for such gas after it has been transported from the well site, the State's lessee may legally deduct from the royalty payments for cost of transportation and processing between the well head and the purchasing point when these costs are computed according to standard and acceptable accounting principles.

Yours very truly,

WILL WILSON
Attorney General of Texas

By Robert O. Smith
Robert O. Smith
Assistant Attorney General

Honorable J. Earl Rudder, page 6 (WW-196)

APPROVED:

OPINION COMMITTEE

H. Grady Chandler, Chairman

Larry Jones
Joe Rollins
Milton Richardson

REVIEWED FOR THE ATTORNEY
GENERAL BY:

Geo. P. Blackburn